**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**AMY NECAISE**                                                              **PLAINTIFF**

**v.**                                        **CIVIL ACTION NO. 1:24-cv-115-TBM-RPM**

**BAY ST. LOUIS-WAVELAND
SCHOOL DISTRICT**                                                           **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Bay High School is the only high school in the Bay St. Louis-Waveland School District, and Amy Necaise was the principal at Bay High School for over a decade. As the principal of the most visible school in the district, Necaise was aware of the importance of the school district's rules and policies. However, Necaise undisputedly violated the policy that requires employees to tell their supervisors about any arrests or criminal charges within twenty-four hours.

Necaise was initially charged with a misdemeanor for allegedly shoplifting at Walmart on August 20, 2023. News outlets immediately reported on the charge. A week later, she was charged with two more misdemeanors for allegedly shoplifting on two other dates: August 1 and August 15. While she reported the first shoplifting charge to her supervisor, Sandra Reed, Necaise failed to report the other two charges. The media coverage exploded after the two new charges and after national news outlets covered the story. In fact, Reed first learned about the new charges when a newspaper reporter called and asked for comments. Necaise was then asked to resign because she failed to report the two additional charges.

Necaise now claims that her resignation was sex-based discrimination because she is a woman. Necaise puts forward this argument even though she was employed with the school district for over twenty years, she undisputedly violated the school district policy, Reed is also a female,

and Necaise ultimately pled no contest to one of the shoplifting charges. Regardless, she seeks relief against the school district under Title VII and 42 U.S.C. § 1983.

Necaise's claims fail. Notably, Necaise does not identify any genuine issues of material fact that need to be resolved by a jury. As to her Title VII claim, Necaise does establish a *prima facie* case on the basis that she was replaced by a male principal. She does not, however, demonstrate a *prima facie* case as to whether she was treated differently from any similarly situated males who may have been arrested and also failed to report their charges. Further, the school district has put forward a legitimate, nondiscriminatory reason for asking Necaise to resign, which was her failure to comply with the school district's policy. And Necaise failed to show that the school district's proffered reason was merely pretext for discrimination. Her Section 1983 claim must be dismissed as well for all of the reasons set forth below. The Motion for Summary Judgment [38] is granted.

## I. BACKGROUND AND PROCEDURAL HISTORY

Amy Necaise was the principal of Bay High School. [1-2], p. 2. She was employed with the Bay St. Louis-Waveland School District ("the school district") for twenty-four years and was the principal of Bay High School for eleven of those years. [38-4], pps. 21-22. As principal of Bay High School, Necaise was required to comply with the school district's employee handbook and policies. The school district's handbook states: "An employee who is arrested or charged with a felony or misdemeanor is required to notify his or her immediate supervisor and the Superintendent as soon as possible but not later than within 24 hours. Failure to report such incidents may result in disciplinary action up to and including termination." [38-3], p. 1.

On August 20, 2023, Necaise was stopped at Walmart for allegedly shoplifting. [39], p. 4. The Walmart employees questioned Necaise because "they had reason to believe that [Necaise]

2

didn't pay for all the things" in her shopping cart. [38-4], p. 36. The Walmart employees then reviewed Necaise's receipt and confirmed that she had not paid for all the items in her cart. *Id.* Necaise called her husband and brother, who was also her attorney at the time, to tell them about the incident. *Id.* at p. 37. Police officers arrived at the Walmart to review the security tapes. *Id.* The officers told Necaise there was a chance that Walmart might press charges against her, but Necaise was allowed to leave the Walmart. *Id.* at pps. 38-39.

When Necaise left the Walmart, she met with her husband, who told her that he already contacted Sandra Reed, the school district's superintendent and Necaise's supervisor. *Id.* at p. 39. Reed then asked for Necaise's address and said she "was coming to [Necaise's] house." *Id.* at pps. 40-41. When Reed arrived at Necaise's house, she advised Necaise to work from home the following day. *Id.* She also questioned Necaise about her retirement eligibility. *Id.* at p. 40.

Two days later, on August 22, 2023, Necaise was contacted by the Waveland Police Department, who informed her that Walmart had filed a charge against her for shoplifting. *Id.* at p. 45. Necaise immediately informed Reed of the charge. *Id.* Necaise then reported to the police station. *Id.* By 6:00 PM on August 22, Necaise's charge was already attracting media attention.[1]

A week later, on August 29, 2023, Necaise received another call from the Waveland Police Department. *Id.* at pps. 65-66. They informed Necaise that she was also charged for shoplifting from Walmart on August 1 and August 15, 2023. *Id.* at p. 62. Necaise went to the police station and

---

[1] Margaret Baker, *Longtime Mississippi Coast principal arrested for shoplifting at Walmart, police say*, SUNHERALD, https://www.sunherald.com/news/local/crime/article278503489.html (originally published Aug. 22, 2023, 5:51 PM); *see also Mealey v. Gautreaux*, No. 16-716, 2020 WL 515853, at *23 (M.D. La. Jan. 31, 2020) ("Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles."); *L.R. v. Cigna Health & Life Ins. Co.*, No. 6:22-CV-1819-RBD-DCI, 2023 WL 3479064, at *2 (M.D. Fla. May 16, 2023) ("Courts may take judicial notice of newspaper articles for the limited purpose of noting statements within the article, but not to determine the truth of the matters asserted in the article." (internal quotations omitted)).

left on August 29 at 4:00 PM. *Id.* at p. 65. Necaise did not tell Reed about the subsequent charges. *Id.* at pps. 66, 69. Necaise claims that she was under the impression that the three charges were "one case" and "one misdemeanor charge." *Id.* at p. 74. However, it is undisputed that the three allegations of shoplifting occurred on three different dates and resulted in three different charges. *Id.* at p. 32.

On August 30, 2023, Necaise traveled to the school district's office to discuss her transition from the role of high school principal to a role in the central office. *Id.* at p. 68; [39], p. 6. Necaise did not tell her staff or Reed about the subsequent charges. [39], p. 6. Following the meeting, Necaise and Reed did not speak again until August 31, 2023. [38-4], pps. 77-79.

On August 31, Reed first learned about Necaise's new criminal charges by a newspaper reporter when the reporter called and asked for comments. [38-6], p. 17. It was only then that Necaise confirmed to Reed that the new charges existed, which was outside the twenty-four hour window required by the school district's handbook. *Id.* Additionally, during this timeframe, national media began picking up the news story.[2]

On September 1, 2023, Reed and Nicole Menotti, the assistant superintendent, met with Necaise. [39], p. 6. Reed informed Necaise that she was being terminated for violation of the school district's handbook and for failing to report the additional charges within twenty-four hours. *Id.*;

---

[2] Margaret Baker, *Longtime Mississippi Coast principal arrested again on new Walmart shoplifting charges*, YAHOO NEWS, https://www.yahoo.com/news/longtime-mississippi-coast-principal-arrested-195915926.html (Aug. 31, 2023, 2:51 PM). The Court reiterates that it can take judicial notice of press releases and news articles "only to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015) (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)).

*see also* [38-16], p. 1. The school district and Reed allowed Necaise to resign in lieu of termination.[3]

[39], p. 6; *see also* [38-8], p. 1. Media reported all of this on the same day.[4]

On September 28, 2023, Necaise filed a charge with the EEOC. [1-2], p. 4. She claimed that the school district had discriminated against her because she is a woman. *Id.* Necaise said she was forced to resign from her position because she "was wrongly accused of a misdemeanor[.]" *Id.* She further alleged that, while she was forced to resign from her position as principal for violating school district policy, male counterparts remained undisciplined. *Id.*

In November 2023, Necaise pled *nolo contendere* to one shoplifting charge.[5] *See* [38-4], pps. 125, 128; *see also* [44-2], p. 1. Necaise testified that the two remaining charges were dismissed. *See* [38-4], p. 125; *see also* [44], p. 4.

The EEOC issued Necaise a right to sue letter on January 18, 2024. [1-2], p. 5. Necaise then filed her Complaint in state court on March 14, 2024. *Id.* at p. 1. In her Complaint, Necaise claimed violations of Title VII and 42 U.S.C. § 1983 because "the [school district] discriminated against Plaintiff based on her gender, treating female employees more harshly than male employees." *Id.* at pps. 1, 3. The school district removed this case to this Court on April 17, 2024. [1], p. 1. The school district has filed a Motion for Summary Judgment [38] now that discovery has concluded.[6]

---

[3] Reed confirmed that the difference between resignation and termination here was "[j]ust semantics." [38-6], p. 29.

[4] *See* Margaret Baker, *MS principal charged in shoplifting cases set to resign after policy violation, officials confirm*, SUNHERALD, https://amp.sunherald.com/news/local/crime/article278863829.html (originally published Sept. 1, 2023, 2:46 PM).

[5] *See United States v. Farrar*, 876 F.3d 702, 706 (5th Cir. 2017) ("[A]lthough it is said that a plea of *nolo contendere* means literally I do not contest [the charge], and is a mere statement of unwillingness to contest and no more, it does admit every essential element of the offense . . . Hence, it is tantamount to an admission of guilt for the purposes of the case[.]" (quoting *Lott v. United States*, 367 U.S. 421, 426, 81 S. Ct. 1563, 6 L. Ed. 2d 950 (1961)).

[6] Also before the Court are Necaise's Motion to Strike [43] and Motion *in Limine* [50]. The Court will address each below.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). It is the burden of the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there is a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

"A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotations omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (quotations omitted).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citation omitted). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).

## III. DISCUSSION

### A. Motion for Summary Judgment

#### i. Title VII

Title VII forbids employers from discriminating against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove intentional discrimination under Title VII through either direct or circumstantial evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007). Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). But when, as here, a plaintiff relies on circumstantial evidence to prove her Title VII discrimination claim, the *McDonnell Douglas* burden-shifting framework applies. *Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 648-49 (5th Cir. 2025); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under this framework, Necaise bears the initial burden of making out a *prima facie* case of sex discrimination. *Shahrashoob*, 125 F.4th at 649 (citing *Watkins v. Tregre*, 997 F.3d 275, 281-82 (5th Cir. 2021)). To meet her initial burden, she must show that she (1) belongs to a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside her protected group. *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (quoting *Stroy v. Gibson ex rel. Dep't of Veterans Affs.*, 896 F.3d 693, 698 (5th Cir. 2018)).

If Necaise makes a *prima facie* case, the burden shifts to the school district to articulate some legitimate, nondiscriminatory reason for the underlying employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (abrogated on other grounds). "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Id.* If the school district can show a legitimate, nondiscriminatory reason for its decision, then the presumption of discrimination disappears. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011).

In the final step of the burden-shifting framework, Necaise is given a "full and fair opportunity to demonstrate" that the school district's proffered reason is merely pretext for unlawful discrimination. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002); *see also Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 406 (5th Cir. 2021). An example of pretext is when a false reason is given for an adverse employment action that hides or serves as a cover-up of the employer's true motive for the action. *Thomas v. Plains Marketing, L.P.*, Civil Action No. 2:24-cv-25-TBM-RPM, 2025 WL 3252403, at *4 (S.D. Miss. Sept. 30, 2025) (citing *McDonnell Douglas*, 411 U.S. at 805).

### a. Administrative exhaustion

As a threshold matter, the Court must first determine whether Necaise properly exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Necaise alleges in her lawsuit that the school district violated Title VII because she was replaced by a male principal and because similarly situated males were allegedly treated more favorably when they were faced with criminal charges and did not report their charges. Yet Necaise did not include all of that in her EEOC claim. So the school district concedes exhaustion as to Necaise's

similarly situated comparator argument, but it argues that Necaise failed to exhaust her administrative remedies as to her replacement claim.

Before seeking judicial relief under Title VII, complaining employees must exhaust their administrative remedies by filing a charge of discrimination with the EEOC. *See Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). But the EEOC charge is just one step in the grievance process for employees claiming discrimination under Title VII. *See Paugh v. Lockheed Martin Corp.*, 474 F. Supp. 3d 861, 866 (W.D. Tex. 2020). The EEOC must then issue a statutory notice of the right to sue. *See Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002).

The scope of the exhaustion requirement has been defined in light of two competing Title VII policies. *Pacheco*, 448 F.3d at 788. On one hand, because the provisions of Title VII were designed "to protect equality of opportunity among all employees and prospective employees," and because most complaints are initiated *pro se*, the scope of the EEOC charge should be construed liberally. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463 (5th Cir. 1970); *see also Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447, 451 (5th Cir. 1983). "On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in an attempt to achieve non-judicial resolution of employment discrimination claims." *Pacheco*, 448 F.3d at 788-89. To balance these considerations, the Fifth Circuit "interprets what is properly embraced in review of a Title VII claim somewhat broadly, not solely by the scope of the administrative charges itself, but by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 789 (internal quotations omitted). Accordingly, the Fifth Circuit requires courts "to engage in fact-intensive analysis of the statement

9

given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Id.*

In determining whether a claim can reasonably be expected to grow out of an EEOC charge, courts consider "(1) whether the claim arises from the same set of facts that support the original charge and (2) whether the claim advances the same theory of discrimination as the original charge." *Simko v. United States Steel Corp.*, 992 F.3d 198, 209 (3d Cir. 2021) ("In comparing the two sets of allegations, we look for factual similarities or connections between the events described in the claims, the actors involved, and the nature of the employer conduct at issue . . . But even if we find no factual nexus, we may also consider whether the two sets of allegations advance the same theory of discrimination[.]").

Administrative exhaustion "is not a jurisdictional requirement," *Stroy*, 896 F.3d at 698, but neither is it merely a "procedural 'gotcha' issue." *McClain v. Lufkin Indus.*, 519 F.3d 264, 272 (5th Cir. 2008). Instead, administrative exhaustion "is a mainstay of proper enforcement of Title VII remedies" and "exists to facilitate the [EEOC's] investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws." *Ernst*, 1 F.4th at 337; *see also Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012). And "[t]he party asserting exhaustion as an affirmative defense bears the burden in demonstrating non-exhaustion." *Hamilton v. Promise Healthcare*, No. 23-30190, 2023 WL 6635076, at *3 (5th Cir. Oct. 12, 2023) (citing *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

On September 28, 2023, Necaise filed her EEOC charge, which states:

I have been discriminated against because I am a female. I was wrongly accused of a misdemeanor and fully expect the matter to get resolved in my favor. I was forced to resign by the School District under the threat of termination. Meanwhile, male employees have been charged with more serious charges such as DUI and other

criminal offenses and not only have the male employees not been fired or reprimanded, but the District actively works to ensure that no one ever find outs about the charges made against male employees. One male employee with a history of drug use was using substances to get "high" after a faculty event off campus in front of other faculty and staff and was simply conferenced with as guided by the District level administration.

I want the EEOC to investigate my claims under Title VII.

[1-2], p. 4. The Court will look at the charge's "substance rather than its label" to determine "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Pacheco*, 448 F.3d at 789.

It is true that Necaise's EEOC charge makes no mention of her being replaced by a male principal. But the substance of Necaise's EEOC charge is obviously focused on sex discrimination. In her EEOC charge, Necaise explicitly asked the EEOC "to investigate [her] claims under Title VII" on the basis that she was being discriminated against "because [she] [is] a female." [1-2], p. 4. While her replacement might not be temporally related to her resignation such that she was able to include information about her replacement in her EEOC charge, there is indeed a factual nexus between the two acts. To be sure, Necaise's replacement arises out of her resignation. Necaise could not have been replaced had she not resigned. Further, it appears that the actors behind both Necaise's resignation and eventual replacement—Reed and the school district—were the same. Additionally, the employer's alleged conduct—Reed's alleged preference for male employees— further bridges the gap between the two events.

Even if there were no factual nexus between Necaise's resignation and her replacement, they both advance the same theory of discrimination—sex discrimination. Accordingly, the "gravamen" of her resignation and replacement are rooted in sex discrimination and the unfair treatment that Necaise allegedly received "because [she] [is] a female." *See Simko*, 992 F.3d at 211

11

("[T]he EEOC investigation properly focused on 'the gravamen' of [the plaintiff's] complaint— disability discrimination[.]"); *see also* [1-2], p. 4.

Also, Necaise filed the EEOC charge the same month as her termination. Further, at the time she filed the EEOC charge, she may not have even been replaced by a male yet, which is why the legal basis for her sex discrimination claim may have only focused on the similarly situated allegations (i.e., how males who were charged with crimes were treated). Regardless, while it appears that the school district hired Necaise's male replacement after the EEOC charge was filed, "[i]f a discriminatory act occurs after a plaintiff files [her] EEOC charge, [she] need not file an additional charge if the new allegations are 'fairly [or reasonably] within the scope of . . . the investigation arising' out of the initial charge." *Simko*, 992 F.3d at 212 (quoting *Waiters v. Parsons*, 729 F.3d 233, 237 (3d Cir. 1984)).

Moreover, as the party asserting exhaustion as an affirmative defense, the burden is on the school district to demonstrate non-exhaustion of Necaise's claim. *See Hamilton*, 2023 WL 6635076, at *3. While the school district says that Necaise should have included factual allegations related to her replacement in her EEOC charge and Complaint, the school district does not put forward a timeline to show when Necaise was replaced by a male. And Necaise was required to file her EEOC charge within 180 days of her termination. Again, while unclear, it appears that the school district hired Necaise's male replacement *after* the EEOC charge was filed. Further, the school district does not cite to any case that has accepted its more narrow view of administrative exhaustion for these types of situations.

The Court finds that Necaise successfully exhausted her Title VII claims.

12

**b. *Prima facie* case**

**1. Replaced by a male**

The school district does not refute that Necaise was replaced by a male principal. Indeed, the only argument that the school district presents as to Necaise's replacement claim is administrative exhaustion. *See* [47], pps. 2-5. But Necaise exhausted her administrative remedies. And she sets forth a *prima facie* case of sex discrimination, at least as to being replaced by a male principal.

**2. Similarly situated comparators**

Necaise comes up short with regard to her similarly situated claim though. Necaise argues that she was treated less favorably than male employees who were charged with crimes and did not timely report those charges.

The Fifth Circuit requires an employee who offers a fellow employee as a comparator to demonstrate that the employment actions at issue were taken under "nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Employment actions include ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating. *Jackson v. Honeywell Intern., Inc.*, 601 F. App'x 280, 284 (5th Cir. 2015). Employment actions are taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment determined by the same person, and have essentially comparable violation histories. *Lee*, 574 F.3d at 260. "And, critically, the plaintiff's conduct that drew the adverse employment [action] must have been 'nearly identical' to that of the proffered comparator who allegedly drew

[a] dissimilar employment [action]." *Id.* (citing *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004)).

Necaise offers three male comparators who she claims are similarly situated: Zach Halley, Kelton Thompson, and David D'Angelo.[7]

**A. Same job or responsibilities**

Necaise does not argue that her three comparators shared the same job or responsibilities as her, but the Court finds it important to highlight the stark difference between Necaise's job and responsibilities and those of her comparators.

Necaise was the principal of the only high school in the school district. Necaise testified that she was responsible for the "safety of students[,] . . . personnel on campus, curriculum, supervising and leading [a] leadership team[,] [and] . . . interventions and schedules and supervision." [38-4], p. 27.

Halley, Thompson, and D'Angelo, on the other hand, were all teachers and coaches. And maybe just assistant teachers and coaches. That is unclear. As to Halley, Necaise testified that he was "a teacher and a coach." [38-4], p. 146. But Necaise does not specify whether Halley was an assistant coach, whether he coached a junior varsity or varsity team, or even what sport he coached. But even if Halley were the head coach of a sport, it would not be enough to make Necaise and Halley similarly situated. *See Samsel v. Desoto Cnty. Sch. Dist.*, 242 F. Supp. 3d 496, 522 (N.D. Miss. 2017) (finding that head coach was "under [the principal's] authority."). And to be sure, the

---

[7] In her deposition and declaration, Necaise also offered Derrick Willis as a comparator. [38-4], pps. 48-52; [44-2], p. 9. But in responding to the school district's summary judgment motion, Necaise does not mention Willis or address the school district's argument regarding Willis. Necaise therefore waives this issue and the offering of Willis as a comparator. *See Mosley v. Liberty Mutual Ins. Co.*, No. 3:21-CV-1699-l, 2023 WL 1871111, at *7 (N.D. Tex. Feb. 9, 2023).

same is true for Halley's teaching position. Necaise does not provide any specifics as to the subject Halley taught, the level of his teaching position, or whether Halley was an assistant teacher.

Like Halley, Thompson and D'Angelo were also teachers and coaches. *See* [38-4], pps. 138, 148-150. Necaise does not address their job titles and related responsibilities.[8]

Again, Necaise concedes that she had a different job and different responsibilities than Halley, Thompson, and D'Angelo. *See* [38-4], pps. 151-52 (Necaise affirmed that "a teacher/coach is a completely different position than being a high school principal" and that "they have different job responsibilities."). Regardless, with what little specific information Necaise provides, she fails to recognize the magnitude of her position as principal in comparison to teachers and coaches of unnamed subjects and sports. Indeed, Halley, Thompson, and D'Angelo were *under* Necaise's authority.[9] Though Necaise does not attempt to compare her job and responsibilities with those of the teachers and coaches, courts within the Fifth Circuit have recognized the distinction. *See Normore v. Dallas Indep. Sch. Dist.*, 677 F. Supp. 3d 494, 526 (N.D. Tex. 2023) ("[T]he record does not support that Simmons was 'similarly situated' as Normore because [] it is undisputed that Simmons was the principal of Pinkston whereas Normore was a teacher who . . . coached girls' basketball[.]"); *see also Suggs v. Lowndes Cnty. Sch. Dist.*, 804 F. Supp. 2d 510, 517 (N.D. Miss. 2011) (finding that assistant principal and teacher were not similarly situated because they worked

---

[8] In her deposition, Necaise clarified that Thompson was a basketball coach. [38-4], p. 138. The clarification ends there. And in any event, Necaise did not include this information in the body of her response to the Motion for Summary Judgment. *See* [44]. The Court emphasizes that it does not have a duty to sift through the record and that a party must provide citations to specific portions of the record on which they rely. *Keen v. Miller Env't Grp.*, 702 F.3d 239, 249 (5th Cir. 2012).

[9] Necaise testified that she was the "immediate supervisor" for Halley, Thompson, and D'Angelo's teaching positions. *See* [38-4], pps. 52, 138, 146, 147, 150, 152.

in different divisions and had different responsibilities.). So too does this Court. Necaise does not share the same job or responsibilities with her comparators.

The Court must weigh the other factors of the comparator analysis, but the stark difference between the positions of high school principal and a teacher-coach is hard to ignore.

**B. Shared the same supervisor or had their employment determined by the same person**

The Fifth Circuit has noted that "a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Lee*, 574 F.3d at 260. Accordingly, "it is sufficient that the ultimate decisionmaker as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor." *Id.* at 260-61.

It is undisputed that Necaise and her comparators had different supervisors,[10] but Necaise attempts to save her comparator argument on the basis that "all employment decisions are ultimately made by Dr. Sandra Reed, regardless of who the immediate supervisor may have been." [44], p. 7. Necaise is correct. But Necaise does not explain why this similarity alone is enough to carry the day.

**C. Comparable violation histories**

As the Supreme Court has instructed, the similitude of employee violations may turn on the "comparable seriousness of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations." *Lee*, 574 F.3d at 261 (citing *McDonald v. Santa Fe Trail*, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976)).

---

[10] *See* [38-4], p. 152; *see also* [44], p. 7.

Necaise claims that her "personnel file [did] not have a single write up or reprimand," but that ignores the three misdemeanor charges at issue in this case. [44], p. 8. Indeed, Necaise received three separate charges for allegedly shoplifting from Walmart on three separate occasions. *See* [38-4], pps. 32, 34, 62, 63. And Necaise arguably violated the school district's policy *twice* when she failed to report her final two charges.[11] Necaise did so despite the fact that she was aware of the policy and the reporting requirement. *Id.* at pps. 32-33. To be sure, Necaise properly reported her first charge just one week before. *Id.*

Halley violated the same provision of the school district policy. Halley was arrested in November 2021 for a DUI, but he did not report his arrest until January 2022. [44-2], p. 9. But it appears that Halley was unaware of the policy and the reporting requirement. *Id.* ("[Halley] realized that he was potentially supposed to be disciplined for not reporting the arrest but said that he did not realize that at the time[.]"). And Necaise testified that Halley immediately reported the arrest to her "once he was informed that he could have discipline for not reporting." *Id.*; *see also* [38-4], p. 50.

Thompson and D'Angelo, on the other hand, did not violate the policy at issue. Indeed, neither Thompson nor D'Angelo were arrested or charged. *See* [38-4], p. 49-50. Accordingly, they could not violate the policy by failing to report an arrest or charge that never occurred. So Thompson and D'Angelo cannot be considered similarly situated comparators. *See Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990). Out of an abundance of caution, however, the Court will address Thompson and D'Angelo's alleged violations. While Thompson allegedly used "a THC vape . . . in front of staff members," he was never arrested or charged for his behavior.

---

[11] *See* [38-4], p. 33 (Necaise agreed that she did not "report [her second and third charges] within 24 hours[.]").

[38-4], p. 136. And D'Angelo's behavior was of similar form. D'Angelo "was randomly selected for a drug test, took it, and prior to the drug test being processed, D'Angelo reported that he believed it would come back positive for some prescription drugs he had taken that were not his." [39], p. 8. D'Angelo did not fail the drug test, and no charges or arrests resulted. *Id.* This is the extent of the information Necaise presents regarding Thompson and D'Angelo.

The Court does not find that any comparator had comparable violation histories. Necaise and her comparators' employment histories are not particularly "marked by a comparable number of serious [] violations," at least based on Necaise's briefing. *See Lee*, 574 F.3d at 261. The Fifth Circuit has found that employees have comparable violation histories when their violation histories were nearly "indistinguishable." *Id.* at 261-62. Halley is the only comparator to have violated the same provision of the school policy as Necaise. But unlike Necaise, Halley received only one charge, which he reported as soon as he was aware of the policy. *See* [44-2], p. 9. Necaise, on the other hand, received three charges and failed to report two of them. [38-4], p. 33. And she did so despite her obvious awareness of the policy. *Id.*

Moreover, while Necaise claims that the school district allows "males to skate by on more serious issues—such as DUIs and drug use," she does not explain how these crimes are more serious in this context. The Court certainly recognizes the gravity of improper alcohol and drug use, especially from those in an academic setting. But the Court also recognizes that Necaise's position was a prominent one that required a great deal of confidence and support from both the school district and the community. *See* [38-6], pps. 16-17. And any parent, student, school board member, or superintendent would be concerned about the high school principal accruing three charges for shoplifting on three separate occasions. To reiterate, the Court does not downplay the

18

seriousness of drug and alcohol offenses. But neither can it downplay the seriousness of Necaise's three alleged charges, especially in light of her position.

### D. Conduct

The conduct at issue is not "nearly identical" when the difference between the plaintiff's conduct and that of their alleged comparators accounts for the difference in employment actions. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001); *see also Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000) (requiring plaintiff to show their employer treated others differently in "nearly identical circumstances" and finding that "the striking differences between the two [employee's] situations more than account for the different treatment they received[.]").

Necaise and Halley's[12] conduct was very different. *Wallace*, 271 F.3d at 221. To start, Necaise was aware of the requirement to report because she reported her first charge just one week prior to her violation. [38-4], p. 45. And as the principal, Necaise was aware of the school district's rules and policies. *Id.* at p. 53. Halley, on the other hand, seemed to be unaware of the reporting requirement. *Id.* Indeed, it appears that there was not a culture of reporting at the time of Halley's violation because even Reed was unfamiliar with the requirement. *Id.*

---

[12] Thompson and D'Angelo did not violate the same policy as Necaise because they were never arrested or charged. Accordingly, the difference in Necaise's "conduct and that of [Thompson and D'Angelo] *accounts* for the difference in treatment received from the employer[.]" *Lee*, 574 F.3d at 260. As a result, "the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.*

And the Court cannot ignore the media attention surrounding Necaise's violation. While Necaise blames Reed for the media frenzy, news outlets reported even Necaise's first charge.[13] The coverage ballooned to a larger national level when Necaise accrued her second and third charges.[14]

"The Court has made every effort to glean information about possible comparators from [Necaise's] briefing. But there is simply not enough to support a *prima facie* case" as to her similarly situated comparator argument. *Saketkoo v. Tulane Univ. Sch. of Med.*, 510 F. Supp. 3d 376, 392 (E.D. La. 2020), *aff'd sub nom. Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990 (5th Cir. 2022).

### c. Legitimate, nondiscriminatory reason

Necaise established a *prima facie* case by demonstrating that she was replaced by a male principal. The burden now shifts to the school district to demonstrate, by a burden of production, a legitimate, nondiscriminatory reason for terminating Necaise.

To prevail at this stage, the school district must clearly set forth reasons for its actions which, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (citations omitted). These reasons must be "clear and reasonably specific." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). But the school district "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. Rather, it is sufficient that the school district's evidence raises a genuine issue of fact as to whether it discriminated against Necaise. *Id.*

---

[13] *See* Baker, *supra* note 1.

[14] *See* Baker, *supra* note 2.

The school district claims they terminated Necaise "because she violated school policy." [39], p. 15. The school district policy "requires that any 'employee who is arrested or charged with a felony or misdemeanor is required to notify his or her immediate supervisor and the Superintendent as soon as possible but not later than [twenty-four] hours." *Id.* The policy further warns that "[f]ailure to report such incidents may result in disciplinary action up to and including termination." *Id.* at 15-16.

Necaise readily admits that she was familiar with this policy. [38-4], p. 30. Necaise also admits that her employment contract, which she signed, required her to follow all "applicable policies, resolutions, rules and regulations of the employer[.]" *Id.* at pps. 26-27. Further, while Necaise timely told Reed about the first charge, Necaise admits that she did not report her second and third charges within the required twenty-four hour period. [38-4], pps. 32-33. By admitting that she did not report the second and third charges within the required time frame, Necaise admits that she violated the school district's policy. Failure to perform in accordance with standards set by an employer is sufficient to constitute a legitimate reason for termination. *See Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985). And Title VII does not protect an employee who violates the employer's rules. *Id.*

Further, Reed testified that "the high school principal . . . is probably the most high profiled position in the [] district, [and] requires . . . a great deal of trust[.]" [38-6], pps. 16-17. As the face of the school, a leader within the school district, and a respected figure in her community, it stands to reason that Necaise's violation would result in her termination. And to add insult to injury, the media firestorm only sensationalized Necaise's violation. Regardless, Necaise readily

concedes that she failed to report her second and third charges. The school district has demonstrated that Necaise was terminated for her violation of the policy.

Because the school district's burden at the second step of the *McDonnell Douglas* framework is one of production rather than persuasion and "involves no credibility assessment," the Court finds the proffered reasons meet this standard. *McCoy*, 492 F.3d at 557 (abrogated on other grounds). The school district has provided evidence, which taken as true, permits the conclusion that there was a legitimate, nondiscriminatory reason for terminating Necaise.

### d. Pretext

Because the school district has produced a legitimate, nondiscriminatory reason for terminating Necaise, "the presumption of discrimination [has] disappear[ed]," and Necaise now "bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that [the school district] intentionally discriminated against her because of her protected status." *Vaughn*, 665 F.3d at 637. To do so, Necaise must put forward evidence rebutting the nondiscriminatory reason the school district articulates. *Id.* Evidence of pretext must be "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996). "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 579 (5th Cir. 2020). And a "plaintiff may establish pretext . . . by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal citations omitted).

Necaise argues that the school district's reason for terminating her is pretext because "females[15] are [allegedly] the only employees terminated for [] failing to report criminal charges—not men." [44], p. 10.  But the female examples from Necaise are so lacking in information that they do not create a genuine issue of material fact. Further, where decision makers are in the same protected group, there is a presumption that unlawful discrimination is not a factor and that the employer's proffered reasons are not pretextual. *Thomas v. United Airlines, Inc.*, Civil Action No. 4:21-cv-01301, 2023 WL 5690084, at *5 (S.D. Tex. Mar. 31, 2023) (finding that plaintiff could not show that employer's proffered reasons were pretext because the decision makers were in the plaintiff's same protected class).  In any event, Necaise's claims are *not* of such quality and weight to indicate that the school district's reasons were merely pretext.

Necaise further alleges that the school district "was already looking at getting rid of" Necaise before she violated the school district's policy. *Id.* at p. 9. In support, Necaise argues that, despite timely reporting her first charge, she "was already being demoted with reduced pay." *Id.* But Necaise admits that she discussed moving to the central office even before the charges or shoplifting allegations. *See* [38-4], p. 123 ("[Necaise] had talked about moving out of [her] role as principal . . . before any of the charges[.]"). And Necaise's move to the central office following the

---

[15] The female examples that Necaise puts forward are lacking in specifics and not demonstrative of pretext. *See* [44], p. 5. These include "a female custodian [who] was terminated for failing to timely report a criminal charge" and "Joy Weems," who was "not hired because she had children in a parochial school[.]" *Id*. Necaise does not make a substantial showing that this amounts to pretext for discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 144, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (finding that petitioner made "substantial showing" that respondent's explanation was false). Necaise may be citing to these females for some type of use as a comparator. But that is not allowed. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (Title VII requires similarly situated comparators to be "outside of [her] protected class."). And to the extent that Necaise claims that this amounts to a pattern and practice of discrimination, *see* [44], p. 10, that "method of proof is almost exclusively used in class actions, with individual [] discrimination plaintiffs confined to the *McDonnell Douglas* framework." *Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada*, 469 F. Supp. 3d 615 (M.D. La. 2020), *on reconsideration in part*, 495 F. Supp. 3d 392 (M.D. La. 2020).

23

first charge was an informed, voluntary one. *Id.* at pps. 68-70. Indeed, before Necaise accepted the job in the central office, she was aware of the pay decrease. *Id.* at p. 68. Even still, she believed she "should do [it]" and that it would "be best for the school." *Id.* at p. 69. This makes sense in light of the negative media attention Necaise and the school district received even after Necaise's first charge. *Id.* at pps. 70, 144.[16]

Necaise cannot meet her burden.[17] Accordingly, the school district's proffered reason for terminating Necaise is not pretext. Her Title VII sex discrimination claim fails.

### ii. 42 U.S.C. § 1983

Necaise also alleges that the school district's actions are "in violation of [42 U.S.C. § 1983] and the 14th Amendment wherein the City discriminated against [Necaise] based upon her gender, treating female employees more harshly than male employees." [1-2], p. 3.

To state a claim under section 1983, Necaise must allege that some person has deprived her of a federal right guaranteed by the United States Constitution, and that the person who has deprived her of that right acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980). But Necaise brings claims only against the school district, and not against any school district employee in their individual capacity. And there is no vicarious liability under Section 1983. *See Kohler v. Englade,* 470 F.3d 1104, 1114-15 (5th Cir. 2006). Accordingly, the Court must analyze Necaise's Section 1983 claim under the municipal liability framework. Municipal liability, also known as *Monell* liability, under 42 U.S.C. § 1983 requires

---

[16] *See also* [44-2], pps. 1-2 (Necaise quoted an article in which Reed said that "the publicity and social media interaction surrounding this event . . . [became] disruptive at the high school.").

[17] Even if Necaise *had* set out a *prima facie* case as to her similarly situated comparators, the Court would reach the same result because the analysis as to the legitimate, nondiscriminatory reason and pretext would remain virtually the same.

proof of (1) a policymaker; (2) an official policy; (3) and a violation of constitutional rights whose "moving force" is the policy or custom. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

First, a critical question is generally "to decide who is the final policymaker, which is an issue of state law." *Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 166 (5th Cir. 2016). "[L]iability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 165 (quotations omitted). "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* (quotations omitted).

Necaise does not provide a thorough factual basis or identification of any policymaker. Rather, she really just has a basic allegation that the wrongdoing in this case was "spearheaded by Dr. Reed." [44], p. 10. Necaise cites no law to demonstrate that Reed or any superintendent is the policymaker under Mississippi law. Nor does Necaise identify whether Reed possesses final authority to establish policy. Ordinarily, the school board is the policy making body of a school district under Mississippi law. *See, e.g.,* MISS. CODE ANN. § 37-7-301. The superintendent is tasked with carrying out the school board's policies, just as Reed did in this case with the policy requiring employees to report criminal charges. Necaise has not presented proof of a policymaker for purposes of her Section 1983 claim.[18] But out of an abundance of caution, the Court will continue to address the other aspects of a *Monell* claim.

---

[18] Even if Necaise provided any case law or analysis as to Reed's status as a policymaker, the Fifth Circuit has held that superintendents are not policymakers in certain cases. *See Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245

Official policy establishes culpability and can arise in various forms. *Peterson v. City of Ft. Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). A plaintiff may establish a municipal policy for purposes of *Monell* liability in three ways: First, a plaintiff can show written policy statements, ordinances, or regulation. Second, a plaintiff can show a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. Third, even a single decision may constitute municipal policy in rare circumstances when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim. *Webb v. Town of St. Joseph*, 925 F.3d 209, 215-16 (5th Cir. 2019) (internal quotations omitted).

Necaise says "the facts indicate that the [school district] has undertaken a pattern and practice of treating women differently than men." [44], p. 10.  Necaise further claims that "[o]ut of 3 people who failed to timely report a criminal charge, the 2 women were fired while the male was kept on staff and suffered no punishment, while the [school district] tried to [hide] the crime from the public." *Id.* So while Necaise does not explicitly say, it appears that she is trying to establish a policy by offering "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webb*, 925 F.3d at 215-16.

A pattern is tantamount to official policy when it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson*, 588 F.3d at 850 (quotations

---

(5th Cir. 1993) ("That Superintendent Wright may have been delegated the final decision in the cases of protested individual employee transfers does not mean that he had or had been delegated the status of policymaker, much less final policymaker, respecting employee transfers . . . the Court carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority.") (emphasis in original). Although Reed may have discretion to hire and fire employees, that does not mean that she has final policymaking authority. *See also* MISS. CODE ANN. § 37-6-7 ("Each school district shall be governed by a school board consisting of five (5) members, selected in the manner provided by law"); *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 381 (applying Texas law and holding that school district's Board of Trustees, not district superintendent, had policymaking authority for hiring, although Board could hire only persons recommended by the superintendent).

26

omitted). Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Id.* (quotations omitted). It is clear that a plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case." *Id.* at 850-51. A pattern requires similarity and specificity. *Id.* at 851. "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id.* (citing *Estate of Davis ex rel. McCully v. City of North Richmond Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). A pattern also requires "sufficiently numerous prior incidents." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).

Necaise offers that she, Halley, and a female custodian all violated the school district's handbook for failing to report an arrest or charge. [44], pps. 4-5.[19] Halley violated the handbook in January 2021, Necaise in August 2023, and the custodian in September 2023. [44-2], p. 9; [44-3], p. 4. Accordingly, Necaise has identified only one *prior* incident. Halley violated the school district handbook well-before Necaise, but he was not terminated for his actions. The female custodian, on the other hand, was terminated one month *after* Necaise. By offering only one prior incident, Necaise has not established a pattern tantamount to an official policy. *See Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (holding that eleven prior incidents did not support a pattern); *see also*

---

[19] Inapposite, Necaise adds that "[a]t least 2 other men were guilty of criminal conduct of which the Defendant was well aware and did nothing. And another male employee threatened to assault a student's parent, while Reed responded with a laugh. Another female was not hired because she had children in private school, but a man was hired despite having children in private school." [44], p. 10. These proffered comparators have no effect on Necaise's Section 1983 claim. *See Swilley v. City of Houston*, 457 F. App'x 400, 404 (5th Cir. 2012) (requiring elements of Section 1983 claim and Title VII claim to be the same when the causes of action are parallel to one another). To be sure, they cannot be considered similarly situated comparators because their conduct was distinct from Necaise's. *See Lee*, 574 F.3d at 260.

*Peterson*, 588 F.3d at 851 (holding that twenty-seven complaints were insufficient to establish a pattern of excessive force). And to be sure, it cannot be ignored that Necaise's charges garnered significant media attention due to her position as principal. Indeed, a flood of negative publicity surrounded Necaise and her shoplifting charges. As the principal, Necaise's role and influence in the community cannot be understated.

Finally, Necaise asserts that the school district's actions were in violation of the Equal Protection clause of the Fourteenth Amendment. [44], p. 10. The Equal Protection clause forbids a state from "deny[ing] to any person within its jurisdiction the equal protections of the laws. U.S. Const. amend. XIV, § 1. To prove a Fourteenth Amendment Equal Protection claim, a plaintiff must allege that the government treats her differently than others similarly situated. *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988). But when, as here, a Section 1983 claim parallels a Title VII claim, "the elements required to be established for each claim are deemed the same under both statutes." *Swilley*, 457 F. App'x at 404 (quoting *Merwine v. Bd. of Trs. for State Insts. of Higher Learning*, 754 F.2d 631, 635 n.3 (5th Cir. 1985)). The Court has discussed the issue of whether similarly situated persons outside of Necaise's protected group were treated more favorably within the context of Necaise's Title VII claim. Necaise failed to prove that any of her proffered comparators were similarly situated. Further, there was no constitutional violation for all the reasons previously stated in this opinion. Accordingly, Necaise fails to prove that the school district's actions were in violation of the Equal Protection clause of the Fourteenth Amendment. And there was no evidence that Necaise was treated differently in any meaningful way that would rise to the level of a constitutional violation.

28

**B. Motion to Strike**

Necaise asks the Court to strike several exhibits attached to the school district's Motion for Summary Judgment, including:

38-1 Waveland Police report

38-5 Waveland Police Report

38-5 Case Report

38-11 Wal-Mart Videos

38-13 Case Report

A motion to strike is "a drastic remedy to be resorted to only when required for the purposes of justice" and, "because of the practical difficulty of deciding cases without a factual record, it is well established that the action of striking . . . should be sparingly used." *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962). Indeed, "motions to strike are generally disfavored." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982). And the Court finds that Necaise has not provided sufficient authority to support her motion to strike. *See Garity v. Donahoe*, No. 2:11-cv-01805-MMD-CWH, 2013 WL 4774761, at *3 (D. Nev. Sept. 4, 2013); *see also Dykes v. Sears Roebuck & Co.*, Civil Action No. 2:10-CV-119-KS-MTP, 2012 U.S. Dist. LEXIS 15924, at *2 (S.D. Miss. Feb. 9, 2012) (denying plaintiffs' motion to strike because they "failed to establish they are entitled to the relief requested."). Even so, the Court did not rely on these exhibits in reaching its opinion as evidenced by the analysis section of this opinion.

The Motion to Strike [43] is denied.

29

## C. Motion *in Limine*

Necaise asks the Court to exclude both that she "pled no contest to the criminal charges" and "[d]ocuments produced by Wal-Mart." [50], p. 2.

The legal standard for a motion *in limine* is well-established:

> A motion *in limine* is a motion made prior to trial for the purpose of prohibiting opposing counsel from mentioning the existence of, or alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on jurors' minds.

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1310 n.1 (5th Cir. 1977). Because the Court grants summary judgment, the Motion [50] is denied as moot. *See Howard v. Brookshire Grocery Co.*, No. 23-30448, 2025 WL 3111596, at *2 (5th Cir. Nov. 6, 2025). But in any event, the Court did not consider these facts in the analysis of applying the facts to the law.

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that Defendant Bay St. Louis-Waveland School District's Motion for Summary Judgment [38] is GRANTED.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff Amy Necaise's Motion to Strike Exhibits [43] is DENIED.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff Amy Necaise's Motion *in Limine* [50] is DENIED as MOOT.

SO ORDERED AND ADJUDGED THIS, the 31st day of March, 2026.

_____
**TAYLOR B. McNEEL**
**UNITED STATES DISTRICT JUDGE**

30